IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sandra L. Shade,                          :
                          Petitioner      :
                                          :
     v.                                   :  No. 885 C.D. 2020
                                          :  SUBMITTED: March 26, 2021
Unemployment Compensation                 :
Board of Review,                          :
                          Respondent      :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                    FILED: May 17, 2021

Sandra L. Shade (Claimant) petitions for review of the August 10, 2020 Order of the Unemployment Compensation Board of Review (Board) affirming the decision of a Referee to deny Claimant unemployment compensation (UC) benefits. The Board concluded that Claimant was ineligible for UC benefits because she was discharged from work for willful misconduct under Section 402(e) of the Unemployment Compensation Law (Law).[1]  We affirm.

## **Background**

Claimant worked as a full-time Direct Support Professional for Shadowfax Corporation (Employer) from April 5, 2000 through August 14, 2019.  Bd.'s Finding of Fact (F.F.) No. 1; Record (R.) Item No. 3.  Claimant was responsible for providing services in a group home, known as Program 64, for individuals with intellectual and

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law states that an employee shall be ineligible for UC benefits for any week "[i]n which [her] unemployment is due to [her] discharge or temporary suspension from work for willful misconduct connected with [her] work."  43 P.S. § 802(e).

developmental disabilities. Bd.'s F.F. No. 2; Notes of Testimony (N.T.), 12/11/19, at 5, 10. Employer has a progressive discipline policy, of which Claimant was aware, in which an employee will receive a verbal warning, a written warning, and 30-, 60-, and 90-day probationary periods before being discharged. Bd.'s F.F. No. 3. Under Employer's policy, disciplinary steps may be skipped based on the severity of the employee's infraction. *Id.*

On December 4, 2017, Claimant received a written warning for unsatisfactory work performance and failure to complete assigned tasks after she failed to schedule medical appointments for the residents in her care. *Id.* No. 4. On June 12, 2018, Claimant received a 30-day disciplinary probation for failing to perform her essential job functions due to recurring performance issues, including: failing to complete shift paperwork; failing to consistently check office voicemails and emails; failing to transport residents to the day program in a timely fashion; failing to use alarms on the cabinets and refrigerators to prevent residents on a restricted diet and residents who have hoarding issues from obtaining food that posed a health and safety risk; failing to clean the house; and failing to assist the residents with their hygiene. *Id.* No. 5. Employer changed Claimant's schedule so she could pick up the residents at the day program by 3:15 p.m., but she continued to be late even after the time change. *Id.* No. 6.

On September 4, 2018, Claimant received a 60-day disciplinary probation for failing to perform essential job functions due to her failure to: check the house voicemail and email; reschedule a cancelled medical appointment; complete paperwork consistently; and ensure the residents' health and safety. *Id.* No. 7.

On January 28, 2019, Claimant received a 90-day disciplinary probation for failing to perform her essential job functions based on the following infractions:

leaving perishable food in her car in violation of state health regulations; failing to properly store medications and order medication refills; failing to complete requisite training in a timely fashion; failing to assist the residents with their hygiene; and failing to properly treat, address, and report a live ant infestation in the home's kitchen. *Id.* No. 8. With regard to the ant infestation, Claimant simply sprayed Windex on the ants and left them on the counter. *Id.*

Claimant was aware that her job was in jeopardy. *Id*. No. 9. After the 90-day disciplinary probation, her supervisor conducted several one-on-one coaching sessions with Claimant. *Id.* No. 10.

On August 14, 2019, Employer discharged Claimant for unsatisfactory work performance and failure to perform her essential job functions based on the following infractions: failing to clean the home; failing to complete paperwork; violating privacy rules by leaving residents' paperwork out in the open; being overdue on three training sessions; and failing to ensure the health and safety of the residents in her care. *Id.* No. 11. Claimant's conduct also placed Employer at risk of violating state health regulations, which could have jeopardized Employer's licensure and subjected Employer to citations. *Id.* No. 12.

Claimant filed a claim for UC benefits, which the local UC Service Center denied. The Service Center found that Claimant was discharged for unsatisfactory work performance after receiving progressive discipline. R. Item No. 4. Claimant's only explanation for her conduct was that "she felt accused of things that were allegations made by [her] co[-]workers." *Id.*; *see* R. Item No. 2. The Service Center determined that Claimant did not establish good cause for her unsatisfactory work performance and, thus, she was ineligible for UC benefits under Section 402(e) of the Law. R. Item No. 4.

3

Claimant appealed to the Referee, who held an evidentiary hearing on December 11, 2019. Employer presented the testimony of Robyn Miner, Senior Associate Director of Human Resources, and Adam Nimon, Associate Director of Residential Services. Claimant testified on her own behalf.

Ms. Miner testified that Claimant had worked for Employer since 2000. N.T., 12/11/19, at 9. Before 2017, Claimant had been subject to other corrective actions, although Ms. Miner could not recall the specifics of those infractions because Claimant's period of employment "spann[ed] 19 years." *Id.*

Ms. Miner testified that Claimant reviewed her job description each year during her performance evaluation. *Id.* She testified that Claimant reviewed and signed her job description most recently on January 14, 2019. *Id.* at 7, 9. The job description Claimant reviewed on that date listed 17 "Essential Functions" of Claimant's position, including:

> 1. Provide ongoing direct supervision of individuals in the program. This includes all aspects of personal care, safety, medication administration, housekeeping, yard work, and all duties as assigned. This includes ensuring individuals['] immediate concerns and needs are dealt with in a timely, orderly manner, with an emphasis on quality and safety. . . . Responsible for awareness of each individual's health needs, scheduling of appointment as necessary, applying knowledge of emergency procedures and medication administration as needed. Transport individuals to and from necessary appointments . . . .
>
> . . . .
>
> 3. Assist[] in the responsibility of program site management [and] supervision[,] including upkeep of furnishings (all furniture, walls, flooring, vehicle, lawn [and] garden, etc.). Perform other duties as assigned, i.e.[,] area maintenance, vehicle maintenance, and cleaning of such.
>
> . . . .

4

5. [E]nsure that agency policies and residential [and] fiscal regulations are followed within the assigned residential site(s). . . . Comply with regulations with respect to health, safety, and paperwork. . . .

. . . .

8. Prepar[e] . . . required or requested reports, forms, or correspondence. Assist in keeping accurate records for maintenance of the residential site(s).

. . . .

10. Attend and coordinate trainings[] . . . .

. . . .

14. Must be able to physically perform the duties of the job[,] including lifting and transferring. . . .

*Id.*, Ex. E-1. Ms. Miner testified that this job description was "substantially the same" as the job description Claimant reviewed in 2018. N.T., 12/11/19, at 7.

Ms. Miner further testified that before discharging Claimant, Employer followed the steps outlined in its progressive disciplinary policy. *Id.*; *see* R. Item No. 3. Specifically, "[Claimant] received a written warning, followed by discipline, probation of 30 days, followed by 60 days, followed by 90 days, and then discharge." N.T., 12/11/19, at 8. Ms. Miner explained that the disciplinary policy allows Employer to skip steps depending on the severity of the infraction. *Id.* With regard to Claimant, Employer decided to skip the initial verbal warning because "the nature of [Claimant's] infraction . . . warranted" a written warning. *Id.*

Mr. Nimon testified that he had supervised Claimant since 2016 and performed weekly visits to the Program 64 home. *Id.* at 10-11. According to Mr. Nimon, Claimant's essential job functions included cleaning the home, assisting the residents

5

with their hygiene, scheduling medical appointments for the residents, and completing required paperwork. *Id.* at 11, 18.

Mr. Nimon testified that "on a consistent basis[,] I would note that there were deficiencies in [Claimant's] performance for not having completed certain tasks," such as scheduling medical appointments for the residents. *Id.* at 11-13. Mr. Nimon explained:

> These individuals are under our care. They cannot coordinate or schedule their own appointments. They depend on us to take care[ of them] and address their health needs[,] and I feel that's an essential job function that was not being met.

*Id.* at 13. Mr. Nimon testified that after Employer issued the initial written warning to Claimant for her failure to schedule medical appointments, her performance did not improve. *Id.* at 14.

Mr. Nimon testified that Employer subsequently imposed a 30-day disciplinary probation on Claimant due to "recurring" performance issues. *Id.* Mr. Nimon elaborated on those issues as follows:

> Not completing each paperwork for her assigned shift. Not completing paperwork when you're running appointments. Not consistently checking the program's mail, interoffice mail, voicemail. Transportation for the individuals, it has to be finished by a certain time, 3:15[ p.m.], and we had even adjusted the start time for the shift from 3[:00] p.m. to 2:45[ p.m.] to help accommodate, I guess to make it more possible. But [Claimant] was still consistently picking up the individuals late[.] . . . [W]e also have alarms and chimes on the fridge and the cabinets due to an individual that has a restricted diet that lives there. I found often during my home visits that these [alarms] weren't being used. [It was] a health and safety risk for the individual, who at that time was amassing perishable food items in her room. Unsatisfactory cleaning, again the floor not consistently swept or mopped, and not sufficiently assisting the individuals with their hygiene.

6

*Id.* at 14-15.

Mr. Nimon testified that he regularly observed hygiene issues with the residents, noting that "[t]hey weren't always shaved, [and it] appeared questionable if they showered or bathed sometimes." *Id.* at 20, 25-26. One individual in Claimant's care developed a large rash on her abdomen. *Id.* at 20.

Mr. Nimon also testified to his personal observations of the home's condition during his weekly visits. He testified that the "[c]leaning was deficient in the house," noting that on several occasions, "there was [fecal matter] smeared on one . . . individual's toilet" and "in the kitchen there were dirty floors" and "[t]he counters were unwiped." *Id.* at 22-23. As an example of a cleanliness issue, Mr. Nimon testified that during one of his unannounced visits, he discovered "ants all over the kitchen counter" and testified that Claimant "hadn't notified anybody" about the ants; instead, "[she] had just sprayed Windex all over the ants and left them on the counter." *Id.* at 20-21.

Mr. Nimon testified that Claimant often failed to complete required paperwork for her shifts. *Id.* at 26. According to Mr. Nimon, Claimant "frequently . . . missed signatures" and "would not complete the specific documentation for the [residents'] charts." *Id.* at 26-27.

Mr. Nimon testified that prior to Claimant's discharge, he performed several one-on-one coaching sessions with Claimant over the course of a few weeks, wherein he "reviewed positives and negatives" with Claimant and discussed with her "[w]hat she[] [was] doing correct," "what she could be doing better," and "[w]hat she should be doing." *Id.* at 21. Mr. Nimon further explained that Claimant's discharge paperwork outlined the essential job functions that she failed to perform, including ensuring the health and safety needs of the residents are met, scheduling medical appointments, assisting the residents with their hygiene, and cleaning the home. *Id.* at 23-24.

7

However, at the time of her termination from employment, Claimant "refused to sign" the discharge paperwork. *Id.* at 23.

Claimant testified that she was primarily responsible for caring for three residents at Program 64. *Id.* at 34. She described the residents in her care as follows:

> One was very high functioning. . . . We have behavior issues with the one, so . . . a lot of times you get in the middle of your paperwork and you have to go take care of an issue and then you'd forget where you are or . . . you thought you had finished it.

*Id.* Claimant testified that she cleaned the kitchen "every day" and she swept the floors "usually . . . in the evening[s]." *Id.* at 33.

With regard to the residents' hygiene, Claimant testified, "I do the laundry every week and . . . two [or] three times a week I do the girls['] laundry. The one individual that is high functioning did her own laundry." *Id.* She testified that the resident with the abdominal rash always "came [home] from [the] day program . . . absolutely soaked," so Claimant applied powder to her body "every morning and every afternoon or evening." *Id.* at 35.

Claimant admitted that on one occasion, she failed to notify a staff member that a resident's medical appointment had been cancelled. *Id.* at 34. She testified that she wrote the message down on a tablet beside the phone near the garage and hoped that if "people c[a]me through the garage . . . [a]nybody that came in after" her would find the note. *Id.* With respect to the allegation that she regularly failed to complete paperwork, Claimant stated that she tried to complete her paperwork, but "I think we all miss signatures. We get tied up with the girls." *Id.*

When asked about the ant infestation, Claimant testified as follows:

> [Claimant's counsel:] With respect to the allegation that there were ants on the kitchen counter, how to do you respond to that?

8

[Claimant:]  That is true.  I had a doctor appointment right after I got the girls up.

[Claimant's counsel:]  Your own personal appointment?

[Claimant:]  My own personal appointment.  So[] I had to leave on time . . . and I came in and they weren't there before[] . . . when I took the girls to work and I said, oh my gosh.  So[] I'm looking around to see if we have anything on that floor and . . . I thought well I'm just going to have to squirt them with Windex, because that will kill them, and of course it doesn't kill them instantly.  Then I left the Windex bottle there, so somebody would know that's what I did if they came in after me, because I was coming back.

[Claimant's counsel:]  What did you intend to do when you got back?

[Claimant:]  Clean it up, because they would be dead by then.

*Id.* at 35.

With respect to the kitchen cabinets not being locked or alarmed, Claimant testified, "Most of the time, I have to say that they were locked."  *Id.* at 36.  She explained that sometimes one high-functioning resident would open the cupboards on her own and Claimant "discuss[ed] . . . with [the resident] that she has to relock them and the refrigerator."  *Id.* at 36-37.

At the conclusion of her testimony, Claimant testified that she worked to the best of her ability, she was able and available for work, and she would "be 78 [years old] in January."  *Id.* at 37.

Following the hearing, the Referee affirmed the Service Center's decision, concluding:

[C]laimant was discharged for unsatisfactory work performance and for failing to perform her essential job functions.  [E]mployer progressed through [its] disciplinary steps[,] and [Claimant] was aware her job was

9

in jeopardy. Despite repeated warnings and [one-]on[-one] coaching sessions, [C]laimant continued to fail to perform her assigned duties.

The Pennsylvania [c]ourts have consistently held that mere incompetence, inexperience or inability to do job is not willful misconduct. However[,] a claimant who has demonstrated the skills and abilities to do the job properly but is allowing his work performance to deteriorate through carelessness or negligence will be disqualified for willful misconduct, as it shows a disregard of the claimant's duties and the employer's interests.

*Employer credibly testified in regard to [C]laimant's continued failure to perform her basic job functions, including failure to clean the home, failure to assist the individuals in her care with hygiene[,] and failing to ensure the health and safety needs of the individuals in her care. [C]laimant failed to provide any credible explanation for failing to perform her job duties.* [E]mployer has met its burden.

Ref.'s Order, 12/18/19, at 3 (emphasis added).

Claimant appealed to the Board, which affirmed the Referee's decision. The Board adopted the Referee's findings of fact and conclusions of law and made the following additional findings:

[C]laimant was specifically counseled, on more than one occasion, that she needed to clean her assigned home. Therefore, [C]laimant had a known obligation to ensure the safety and sanitation of her residents and the residents' home, and given her specific counseling, her neglect to ful[l]fil these duties may be inferred to have been both deliberate and intentional. *[C]laimant is discredited in her testimony that she worked to the best of her ability and that she routinely cleaned the floors and counters of her assigned home. Lastly, the Board accepts as credible the testimony of [Mr. Nimon] regarding his personal observations of the assigned home and [C]laimant's performance.*

Bd.'s Order, 8/10/20, at 1 (emphasis added).

With regard to Claimant's specific claims of error, the Board concluded:

[C]laimant contends the underlying allegations that gave rise to her counseling and discipline are hearsay. The Board only relies on

10

[C]laimant's past disciplinary counseling for the purposes of showing [C]laimant was warned about her duties and that she was on notice that her employment may be in jeopardy. [C]laimant also complains that [E]mployer could not rely on her history to establish a baseline of her performance. However, . . . *[C]laimant's performance deficiencies also included a deliberate disregard of her known duties*. Therefore, the Board sees no reason to disturb the Referee's findings and conclusions.

*Id.* (emphasis added). Claimant now petitions for review of the Board's decision.[2]

## Issues

(1)     Was Claimant's Petition for Review timely filed?

(2)     Did the Board err in inferring that Claimant intentionally allowed her job performance to deteriorate?

(3)     Did the Board err in holding Claimant to a higher standard of conduct due to the nature of her job?

## Analysis

### 1. Timeliness

First, we must address the timeliness of this appeal, because Claimant filed her Petition for Review with this Court on September 14, 2020, more than 30 days after the entry of the Board's August 10, 2020 Order. *See* Pa. R.A.P. 1512 (requiring the filing of a petition for review of a quasi-judicial order within 30 days after entry of the order).

On December 1, 2020, this Court entered an Order directing the parties to address the timeliness issue in their principal briefs or by appropriate motion. In response, on December 23, 2020, Claimant filed with this Court: (1) a copy of a postmarked United States Postal Service (USPS) Form 3817 – Certificate of Mailing,

---

[2] Our scope of review is limited to determining whether the necessary factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

and (2) a receipt showing that her counsel presented the Petition for Review for mailing to the USPS on September 9, 2020. The parties also addressed timeliness in their principal briefs as directed.

Pa. R.A.P. 121(c)(2) (emphasis added) provides that "[p]apers required or permitted to be filed in an appellate court" may be filed "by first class, express, or priority [USPS] mail, which service is *complete upon mailing*." Furthermore, Pa. R.A.P. 1514(a) states that the date of filing will be the date that deposit in the mail can be verified through USPS "Form 3817, Certificate of Mailing, or other similar [USPS] form from which the date of deposit can be verified."

Here, Claimant was required to file her Petition for Review with this Court by September 9, 2020, 30 days after the entry of the Board's Order. Claimant's submitted documentation shows that Claimant's counsel mailed the Petition for Review via USPS certified mail on that date. Therefore, we conclude that Claimant's Petition for Review was timely filed.[3]

## 2. Willful Misconduct

Next, Claimant argues that the Board erred in inferring that her failure to improve her work performance was intentional. Specifically, she contends that "any deterioration in her job performance was not due to intentional and deliberate neglect of her duties, but was more reasonably attributable to the difficulty of her job, the length of her work day, and—above all—the fact she was [77] years of age when she was fired." Claimant's Br. at 16. We disagree.

Our Court has defined "willful misconduct" as a wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of

---

[3] On appeal, the Board does not dispute the timeliness of the Petition for Review, stating: "[I]t appears that Claimant complied with Pa.[]R.A.P. 1512 . . . by mailing the [P]etition by certified mail on September 9, 2020 and [by her] counsel certifying the mailing date." Bd.'s Br. at 3 n.1.

the standards of behavior that the employer has a right to expect of its employees, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations. *Miller v. Unemployment Comp. Bd. of Rev.*, 83 A.3d 484, 486-87 (Pa. Cmwlth. 2014). "[M]ere incompetence, inexperience, or inability to perform a job generally will not support a finding of willful misconduct." *Scott v. Unemployment Comp. Bd. of Rev.*, 36 A.3d 643, 647 (Pa. Cmwlth. 2012). However, a claimant who has previously demonstrated the skills and ability to perform a job but allowed her work performance to deteriorate through carelessness or negligence may be disqualified from receiving UC benefits. *Id.* at 648. Once the employer establishes a *prima facie* case of willful misconduct, the burden shifts to the claimant to prove that she had good cause for the behavior. *Kelly v. Unemployment Comp. Bd. of Rev.*, 747 A.2d 436, 438-39 (Pa. Cmwlth. 2000). A claimant establishes good cause by showing that her actions were "justified and reasonable under the circumstances." *Id.* at 439.

The evidence of record establishes, and the Board found, that Claimant was discharged for poor work performance and for failing to perform her essential job functions. Bd.'s F.F. No. 11. Despite repeated warnings and one-on-one coaching sessions, Claimant still failed to satisfactorily perform her essential duties of cleaning the home, assisting the residents with their hygiene, scheduling medical appointments for the residents, and completing required paperwork, and she did so knowing that her job was in jeopardy. Ref.'s Order, 12/18/19, at 3. Although Claimant testified that she consistently performed all of her required tasks, the Board discredited her testimony and instead credited the testimony of Employer's witnesses. Bd.'s Order, 8/10/20, at 1.

13

We find this Court's decision in *Scott* instructive here. In *Scott*, the claimant was a hospital medical technician whose duties included processing trays with instruments to be used by physicians in surgery. 36 A.3d at 645. The hospital had a cleanliness policy requiring that "all instruments and items on [surgical] trays be carefully examined before being processed to ensure that they are clean." *Id.* The claimant was verbally counseled on several occasions "that he must make sure that the instruments and items on the trays were cleaned before the trays were sterilized and sent to the operati[ng] room" and also received a written warning "that any further infractions of the cleanliness policy would result in further discipline, up to and including termination." *Id.* at 645-46. The final incident occurred when "the operating room returned a tray that had been processed by [the c]laimant on August 12, 2010, because the tray contained suture material from a previous surgical operation." *Id.* at 645.

The hospital discharged the claimant for "continued poor work performance in the processing of surgical trays" despite multiple warnings and counseling. *Id.* at 646. The Board determined that the final incident "was not a mistake but was the result of *[the c]laimant's failure to diligently perform an important aspect of his job duties*." *Id.* at 647 (emphasis added). Therefore, the Board concluded that the claimant was ineligible for UC benefits under Section 402(e) of the Law.

On appeal, this Court explained:

> [M]ere incompetence, inexperience, or inability to perform a job generally will not support a finding of willful misconduct. However, *it is well-established that an employee's failure to work up to his or her full, proven ability, especially after multiple warnings regarding poor work performance, must be construed as willful misconduct because such conduct demonstrates an intentional disregard of the employer's interest or the employee's obligations and duties.*

14

*Id.* at 647-48 (emphasis added). In affirming the Board's decision, we emphasized that the claimant admitted at the hearing that he was aware of the hospital's policy, he was capable of performing his job duties, and he had been "previously warned regarding dirty trays." *Id.* at 648. Therefore, we concluded that "[a]t the very least, *[the c]laimant's continued poor work performance demonstrated an intentional disregard of the employer's interest or the employee's obligations and duties*." *Id.* (emphasis added).

Here, as in *Scott*, the Board properly inferred willfulness from Claimant's repeated noncompliance with Employer's directives, in the face of warnings and counseling, and discredited her testimony that she performed her job to the best of her ability. It is well settled that a "[c]laimant's conscious indifference to [her] employment duties is enough to support a finding of willful misconduct." *Cullison v. Unemployment Comp. Bd. of Rev.*, 444 A.2d 1330, 1331 (Pa. Cmwlth. 1982). Moreover, "[p]oor work performance reflecting an unwillingness to work to the best of one's ability is indicative of a disregard for the standard of conduct an employer has a right to expect and may rise to the level of willful misconduct." *Gardner v. Unemployment Comp. Bd. of Rev.*, 454 A.2d 1208, 1209 (Pa. Cmwlth. 1983); *see also McCrea v. Unemployment Comp. Bd. of Rev.*, 487 A.2d 69, 71 (Pa. Cmwlth. 1985) (concluding that the claimant committed willful misconduct, where the evidence showed that the claimant previously performed her work satisfactorily, but her recent performance had progressively worsened, and she failed to improve despite repeated warnings and a suspension). We conclude, based on the credible evidence of record, that Employer met its burden of proving that Claimant committed willful misconduct.

We also conclude that Claimant failed to establish good cause for her actions. Claimant contends that she could not have acted willfully because her advanced age

15

prevented her from improving her performance. At the hearing, however, Claimant presented no evidence that she was incapable of performing her job duties due to her age. The only evidence relating to Claimant's age was her testimony that she worked to the best of her ability and that she "w[ould] be 78 in January." N.T., 12/11/19, at 37. However, Claimant offered no explanation as to why her age prevented her from improving her performance despite repeated warnings, particularly when she knew that her job was in jeopardy. Furthermore, the Board specifically discredited Claimant's testimony that she worked to the best of her ability. Bd.'s Order, 8/10/20, at 1; *see* Ref.'s Order, 12/18/19, at 3 (finding that "[C]laimant failed to provide *any credible explanation* for failing to perform her job duties") (emphasis added).

In addition, Ms. Miner credibly testified that Claimant "reviewed her job description every year, [during] her annual evaluation review" and did so "most recently on January 14, 2019," seven months before her discharge. *Id.* at 9; *see id.* Ex. E-1. Yet there is no evidence that Claimant ever informed Employer that she was having difficulty completing her essential job functions because of her age or any age-related condition. *Cf. Phila. Parking Auth. v. Unemployment Comp. Bd. of Rev.*, 1 A.3d 965, 968-69 (Pa. Cmwlth. 2010) (finding no willful misconduct following the claimant's discharge for falling asleep on the job, where the claimant previously notified the employer that her medical conditions caused drowsiness and she requested additional work so that she would not fall asleep, but the employer did not give her additional work).

Claimant's own testimony demonstrates that she understood the importance of maintaining a sanitary and safe environment in the home and attending to the medical and dietary needs of the residents in her care. Claimant also admitted that she put her own interests before Employer's when she left work to attend a personal appointment

16

after discovering an ant infestation, without notifying anyone and simply assuming that her co-workers would find and take care of the issue. N.T., 12/11/19, at 34-35.

We conclude that Claimant's failure to improve her work performance after repeated warnings and counseling demonstrated an intentional disregard of Employer's interests and of Claimant's obligations and duties, thereby disqualifying her from receiving UC benefits under Section 402(e) of the Law.

### 3. Standard of Conduct

Finally, Claimant asserts that the Board erroneously imposed a higher standard of conduct because of the nature of her job, which is prohibited under our case law. According to Claimant, the Pennsylvania Supreme Court has held that there can only be one standard of willful misconduct and that standard does not carve out an exception for claimants in certain professions. Claimant contends that, contrary to this precedent, the nature of her job was the ultimate factor in both Employer's decision to discharge her and the Board's finding of willful misconduct.

In *Navickas v. Unemployment Compensation Review Board*, 787 A.2d 284, 289-91 (Pa. 2001), our Supreme Court held that a nurse's inadvertent mistake in not properly diluting antibiotics could not be the basis of a willful misconduct finding. In *Navickas*, the Board, relying on a prior line of cases that prohibited certain professionals from arguing mere error or negligence as an excuse for their conduct, stated: "As a nurse[,] the claimant is held to a higher standard of care and negligence or inadvertence is not considered good cause for such conduct." *Id.* at 287. On appeal, however, the Supreme Court rejected this Court's imposition of a higher standard of conduct based on a claimant's profession and, therefore, reversed the denial of UC benefits. The Supreme Court explained its holding as follows:

17

[W]e specifically reject the Commonwealth Court's adoption of an *ad hoc* "higher standard of care" for health care workers, which apparently would permit any act of negligence or inadvertence on the part of a health care worker, standing alone, to be deemed willful misconduct. In so doing, we do not dispute that the needs of certain health care employers are such that they might reasonably deem any act of negligence sufficiently serious as to warrant termination of employment. Nor do we doubt that there are other occupations of sufficient gravity that employers might reasonably conclude that even isolated acts of negligence are sufficiently serious as to warrant termination. But those are questions of policy that are not posed by the . . . Law we are called upon to construe. The [Law] sets forth a single governing standard of willful misconduct, one that does not draw distinctions based upon the type or nature of the employment involved.

*Id.* at 290-91; *see also Grieb v. Unemployment Comp. Bd. of Rev.*, 827 A.2d 422, 427-28 (Pa. 2003) (rejecting a public safety exception to the willful misconduct standard based on a teacher's inadvertent act of bringing unloaded guns onto school property in violation of the school's weapons policy).

However, the Supreme Court in *Navickas* also noted:

This is not to say, of course, that the special needs, interests and expectations of employers and occupations are irrelevant to the question of willful misconduct. As we have noted above, under our precedent, *those considerations are certainly germane to determining, among other things, what are the legitimate rules and expectations of an employer, what constitutes a violation or misconduct under those rules, and when conduct is so egregious or repetitive as to warrant a finding that it is willful*. . . .

787 A.2d at 291 (emphasis added).

In this case, the Board did not conclude that Claimant's actions were merely negligent or that she inadvertently violated Employer's policies, as in *Navickas* and *Grieb*. Rather, the Board concluded that Claimant repeatedly and intentionally failed to perform her essential job functions in the face of direct warnings and counseling, which was a disregard of Employer's interests and of Claimant's known duties. Bd.'s

18

Order, 8/10/20, at 1; *see Scott*, 36 A.3d at 648. Contrary to Claimant's assertion, the fact that the Board made factual findings regarding the nature of Claimant's job duties in reaching its decision did not violate our Supreme Court's precedent. Those findings were relevant to determining Employer's expectations with regard to Claimant's performance and supported the Board's conclusion that Claimant's conduct demonstrated an intentional disregard of Employer's interests. We find no error in the Board's decision.

## Conclusion

Based on the credible evidence of record, we conclude that the Board correctly determined that Claimant's failure to improve her work performance demonstrated an intentional disregard of Employer's interests and of Claimant's job duties. The evidence established that, despite repeated warnings and one-on-one counseling, Claimant continually failed to perform the essential functions of her job, placing the health and safety of the Program 64 residents at risk. Although Claimant testified that she consistently performed all of her required tasks and that she worked to the best of her ability, the Board rejected her testimony as not credible. Claimant also failed to establish good cause for her conduct, as she presented no credible evidence that she was incapable of performing her job duties due to her age. Therefore, we conclude that Employer met its burden of proving willful misconduct.

Accordingly, we affirm the Board's Order.

_____
ELLEN CEISLER, Judge

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sandra L. Shade,                          :
                    Petitioner            :
                                          :
        v.                                : No. 885 C.D. 2020
                                          :
Unemployment Compensation                 :
Board of Review,                          :
                    Respondent            :

# **O R D E R**

AND NOW, this 17th day of May, 2021, the Order of the Unemployment Compensation Board of Review, dated August 10, 2020, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge